[S. F. No. 16832.   In Bank.   Dec. 21, 1943.]

GEORGE BACICH, Appellant, v. BOARD OF CONTROL
OF THE STATE OF CALIFORNIA et al., Respondents.

Hubbard & Hubbard, John J. Batistich and J. C. Miller for Appellant.

U. S. Webb, Attorney General, Earl Warren, Attorney General, Robert W. Kenny, Attorney General, John J. Dailey, Deputy Attorney General, C. C. Carleton, Robert E. Reed, F. M. McAuliffe, Albert M. Monaco and Heller, Ehrman, White & McAuliffe for Respondents.

CARTER, J.—The demurrers of defendants Board of Control, California Toll-Bridge Authority and State Department of Public Works to plaintiff's complaint for damages in this action in inverse condemnation were sustained without leave to amend.

Plaintiff alleges that he is the owner of an improved lot situated on the west side of Sterling Street between the intersection of that street with Bryant Street and Harrison Street in the City and County of San Francisco, the two latter streets being parallel; that before the construction of the improvement hereinafter mentioned Harrison Street was level with Sterling Street and he had access from his lot to Harrison Street by footpaths and street railway; that a street railway extending along Sterling Street served his property; that the area around his property was formerly used for residential purposes; that the construction of the approaches

to the San Francisco Bay Bridge by defendants resulted in the lowering of Harrison Street fifty feet, leaving as the only access thereto an almost perpendicular flight of steps, the destruction of the residence property in the area, the removal of the street railway, and the erection of an elevated highway between his lot and Bryant Street which he must pass under to reach the latter street; that by reason of the foregoing his property has been damaged in the sum of $14,-000; and that he filed a claim for those damages with defendant Board of Control which was rejected.

The demurrer of defendant State Board of Control was properly sustained inasmuch as it had nothing to do with the construction of the improvement or the alleged damaging of plaintiff's property. It is not charged that the Board of Control, a state agency, had anything to do with the construction of the improvement, it being interested only as the recipient of the claim for damages filed by plaintiff.

The failure to name the State of California as a party defendant does not require an affirmance of the judgment. The complaint contains all the elements necessary to state a case against the State and has named the state agencies in their capacity as such which had charge of the construction of the improvement. The action is in effect one against the State. Plaintiff's request for leave to substitute the State as party defendant in place of the defendants Board of Control, California Toll-Bridge Authority, and Department of Public Works should have been granted. (*California Securities Co.* v. *State*, 111 Cal.App. 258 [295 P. 583].) Under those circumstances it is not necessary to consider whether the Toll-Bridge Authority under its statutory powers had authority to do anything with reference to the construction of the improvement which plaintiff alleges caused the damages.

The instant action is predicated upon the constitutional provision that private property may not be taken or damaged for a public purpose without the payment of just compensation. (Cal. Const., art. I, sec. 14.) That clause of the Constitution is self-executing and hence neither consent to sue the State nor the creation of a remedy by legislative enactment is necessary to obtain relief thereunder (*Rose* v. *State of California*, 19 Cal.2d 713 [123 P.2d 505]).

Sections 667 and 688 of the Political Code relating to claims against the State do not constitute an obstacle to recovery on the liability here involved. Section 688 by its terms

applies only to claims based on "express contract or for negligence." The claim here involved is one based upon the liability incurred when the State exercises its power of eminent domain without pursuing the customary procedure therefor. In such a case the cause of action is in inverse condemnation and is not founded either upon express contract or negligence. (*Rose* v. *State of California, supra.*)

Section 667 states in part that: "Any person having a claim against the state, *the settlement of which is not otherwise provided for by law,* must present the same to the board at least four months before the meeting of the legislature, accompanied by a statement showing the facts constituting the claim, verified in the same manner as complaints in civil actions. Before finally passing upon any such claim, notice of the time and place of hearing must be mailed to the claimant at least fifteen days prior to the date set for final action. At the time designated the board must proceed to examine and adjust such claims. It may hear evidence in support of or against them and, with the sanction of the governor, *report to the legislature such facts and recommendations concerning them as may be proper.*" (Emphasis added.)

█ From the italicized portions of that section it is indicated that its purpose was to establish an orderly procedure by which the Legislature would be advised of claims against the State in instances where no provision had been made for their payment. The Legislature would then be in a position to determine, in the light of the investigation and recommendation of the Board of Control whether or not it should make an appropriation to pay the claim. That purpose is also evidenced from other sections appearing in the same article of the Political Code. For illustration, section 664 embraces the presentation of claims to the state controller where an appropriation has been made. Section 665 authorizes the controller to draw a warrant for a claim he has approved, and if disapproved to file it together with his report with the Board of Control. Section 666 involves claims where no appropriation has been made or no fund is available for their payment, the settlement of which is provided by law, or where the fund has been exhausted. Such claims if approved by the Board of Control shall be transmitted to the Legislature. Section 667 deals with the situation where no mode of settlement of the claim has been provided by the law. Essentially,

those sections deal with the means and methods of payment of claims, the conditions under which funds in the state treasury may be allocated to pay claims, and the obtaining of an appropriation from the Legislature when no funds are available. They are concerned with the mechanics of the financial operations of the State with relation to the payment of claims. In order to obtain payment of a claim from funds available therefor, or if not available from an appropriation by the Legislature, the requirements of those sections must be met. The requirement that claims be presented at least four months before the meeting of the Legislature is to give the Board of Control an opportunity to investigate them, thus enabling the ensuing Legislature to give them more intelligent consideration. The clear intent of the statute is that if a claim is to be given consideration at the next session of the Legislature it should be presented four months prior thereto and an investigation made.

Section 667 makes no provision for a flat rejection or approval of the claim by the board. It merely states that the board shall, with the sanction of the governor, report to the Legislature such *facts and recommendations* as may be proper. (See *Sullivan* v. *Gage,* 145 Cal. 759, 765 [79 P. 537], considering similar requirements in the Political Code as then written.) No provision is made for the next steps available to the claimant if the recommendation is unfavorable. The section does not specify what session of the Legislature the four months' period must precede; that is, whether it is the session next following the accrual of the claim or some subsequent session. If the claim accrued during the four months' period immediately preceding a session of the Legislature, certainly compliance could not be had with the section if the next ensuing session of the Legislature were meant. If the claim accrued four months and two days before the next session of the Legislature, the claimant would have only two days in which to present his claim. That would be clearly unreasonable when we consider that his right is created and protected by the Constitution. Also as bearing upon the intent of the Legislature it should be noted that, in 1941, the Legislature added section 688.1 to the Political Code (Stats. 1941, ch. 982, p. 2618), where it for the first time expressly provided that claims must be filed with the board in cases of inverse condemnation and adopted section 688 for the requirements in relation thereto. The act adding that section

expressly declared it inapplicable to pending actions. At the time of its adoption the instant action was pending. All of the foregoing factors manifest the intent that in the case of a claim in inverse condemnation predicated on the Constitution (Cal. Const., art. I, sec. 14) section 667 does not require the filing of a claim with the Board of Control as a condition precedent to an action thereon, nor as a limitation upon the time within which an action must be commenced. Hence, the sufficiency and timeliness of the claim filed by plaintiff in the instant action is immaterial.

The major issue presented in this case is whether or not plaintiff may recover compensation under the constitutional provision (Cal. Const., art. I, sec. 14) in the light of the facts stated by him. He is entitled thereto under the wording of that provision if his property has been taken or damaged for a public use. The solution of that question depends largely upon the character and extent of his property right. If he has a property right and it has been impaired or damaged, he may recover. The test frequently mentioned by the authorities, that he may recover if he has suffered a damage peculiar to himself and different in kind, as differentiated from degree, from that suffered by the public generally, is of no assistance in the solution of the problem. If he has a property right and it has been impaired, the damage is necessarily peculiar to himself and is different in kind from that suffered by him as a member of the public or by the public generally, for his particular property right as a property owner and not as a member of the public has been damaged. (See *Rose* v. *State of California, supra.*)

In the instant case we are concerned with a property right known as the right of access which an owner has in the street upon which his property abuts and which is appurtenant to such abutting property. The function of the court is to determine and define the character and extent of that right. The right of access, being by its terms general in nature, requires definition and clarification as to its extent and character. This is especially true where we are concerned with the constitutional provision which requires that compensation be paid where property is taken or damaged. The property right of access generally is firmly established.

It has long been recognized in this state and elsewhere that an owner of property abutting upon a public street has

a property right in the nature of an easement in the street which is appurtenant to his abutting property and which is his private right, as distinguished from his right as a member of the public. That right has been described as an easement of ingress and egress to and from his property or, generally, the right of access over the street to and from his property, and compensation must be given for an impairment thereof. We are not now inclined to question or disturb that rule. (See *Rose* v. *State of California, supra; Eachus* v. *Los Angeles etc. Ry. Co.*, 103 Cal. 614 [37 P. 750, 42 Am. St. Rep. 149]; *McCandless* v. *City of Los Angeles*, 214 Cal. 67 [4 P.2d 139]; *Lane* v. *San Diego Elec. Ry. Co.*, 208 Cal. 29 [280 P. 109]; *Wilcox* v. *Engebretsen*, 160 Cal. 288 [116 P. 750]; *Williams* v. *Los Angeles Ry. Co.*, 150 Cal. 592 [89 P. 330]; *Brown* v. *Board of Supervisors*, 124 Cal. 274 [57 P. 82]; *Geurkink* v. *City of Petaluma*, 112 Cal. 306 [44 P. 570]; *Bigelow* v. *Ballerino*, 111 Cal. 559 [44 P. 307]; 10 Cal.Jur. 333-335; 18 Am.Jur., Eminent Domain, secs. 181-185; 49 A.L.R. 330; 93 A.L.R. 639.) The precise origin of that property right is somewhat obscure but it may be said generally to have arisen by court decisions declaring that such right existed and recognizing it. (See 18 Am.Jur., Eminent Domain, sec. 181; 41 YaleL.J. 221.) For that reason, in the determination of the extent and character of that right most of the cases rely, without discussion, upon precedents which fit or are analogous to the circumstances present in the case before the court. If the question is one of first impression its answer depends chiefly upon matters of policy, a factor the nature of which, although at times discussed by the courts, is usually left undisclosed. It may be suggested that on the one hand the policy underlying the eminent domain provision in the Constitution is to distribute throughout the community the loss inflicted upon the individual by the making of public improvements. (See 41 YaleL.J. 221-224; 52 Harv.L.Rev. 1176-1177; 3 Harv.L.Rev. 189-205.) Manifestly, the addition to the eminent domain clause in constitutions in most states, including California, of "or damaged" to the word "taken" indicates an intent to extend that policy to embrace additional situations. On the other hand, fears have been expressed that compensation allowed too liberally will seriously impede, if not stop, beneficial public improvements because of the greatly increased cost. (See *Davis* v. *County Commissioners*, 153 Mass. 218 [26 N.E. 848, 850,

11 L.R.A. 750]; 13 Va.L.Rev. 334-337.) However, it is said that in spite of that so-called policy "the courts cannot ignore sound and settled principles of law safeguarding the rights and property of individuals. This [improvement] may be of great convenience to the public generally, but the properties of abutting owners ought not be sacrificed in order to secure it"; and, quoting from Sedgwick on Constitutional Law: "The tendency under our system is too often to sacrifice the individual to the community; and it seems very difficult in reason to show why the State should not pay for property which it destroys or impairs the value, as well as for what it physically takes. . . ." (*Liddick* v. *City of Council Bluffs*, —— Iowa —— [5 N.W.2d 361, 372, 382].)

In some degree those opposed policies are manifested in the conflict between the constitutional mandate that compensation be paid when private property is taken or damaged for a public purpose and the exercise of police power where compensation need not be paid. The line between those two concepts is far from clearly marked. It will be recalled that in the instant case it is alleged that by reason of the lowering of Harrison Street fifty feet below the level of Sterling Street the access that plaintiff formerly had to Harrison Street from Sterling Street has now been lost except for an almost perpendicular flight of stairs. The condition resulted from the construction of a public improvement, namely, approaches to a bridge spanning San Francisco Bay. It does not appear that any compelling emergency or public necessity required its construction without the payment of compensation for property damaged. Therefore, the State may not escape the payment of compensation under the police power.

The ultimate effect of lowering Harrison Street was to place plaintiff's property in a cul-de-sac. Whereas, before he had access to Harrison Street, the next intersecting street from his property on Sterling Street, he now has access in one direction only, that is, to Bryant Street, the next intersecting street in the opposite direction. The existence of access in one direction to the general system of streets has been impaired to the extent that there is now left only the stairway. Plaintiff alleged that formerly Sterling Street was level with Harrison Street, which may be interpreted to mean that general access was available. He does state that formerly he had access by a streetcar line and footpaths. That being

true his access by those modes has been lost except to the extent that the stairway is a substitute for pedestrian access. In that respect his property has been placed in a cul-de-sac. Moreover, his request for leave to amend may be construed to embrace a showing that formerly there was access to Harrison Street for vehicular traffic, or at least that there was a right of way or public street, improved or unimproved, joining Sterling Street with Harrison Street. Furthermore, it is apparently conceded by defendants that a cul-de-sac has been created. That plaintiff's property has been damaged by the impairment cannot be here questioned. The allegation in his complaint that it has been must be taken as true.

Whether or not such impairment is compensable must depend upon the character and extent of his easement of access. Does it extend to a right to pass to the next intersecting streets? Nothing more need be decided in this case; we are not concerned with the correct rule in a case where the obstruction occurs beyond the next intersecting street nor with what the rule may be for rural property. Practically all authorities hold, and we believe correctly, that no recovery may be had where the obstruction is beyond the next intersecting street. (See cases cited: 4 McQuillin, Municipal Corporations [2d ed.], 279-280, sec. 1527; 1 Lewis on Eminent Domain [3d ed.], 350, 383, secs. 191, 203; 25 Am.Jur., Highways, sec. 318; 49 A.L.R. 330; 93 A.L.R. 639.) The extent of the easement of access may be said to be that which is reasonably required giving consideration to all the purposes to which the property is adapted. It is obvious that in the instant case the damage suffered is greater and different than if the obstruction had been beyond the next intersecting street. Where formerly plaintiff had an outlet from his property at both ends of Sterling Street, he now has access at only one end, which definitely affects ingress to and egress from his property. It would seem clear that the reasonable modes of egress and ingress would embrace access to the next intersecting street in both directions. It should be noted that the right is more extensive than the mere opportunity to go on to the street immediately in front of the property. (*Rose v. State of California, supra.*) We are not confronted with the necessity of balancing the conflicting policies heretofore referred to without the aid of persuasive precedent. Many authorities and writers have either declared or intimated that the creation of a cul-de-sac, that is, the blocking of

access to the next intersecting street in one direction is compensable, although the access still exists in the opposite direction to an intersecting street. In other words, the easement is of that extent. (See *Felton* v. *State Highway Board,* 47 Ga.App. 615 [171 S.E. 198]; *City of Chicago* v. *Baker,* 39 C.C.A. 318 [98 F. 830]; *City of Chicago* v. *Burcky,* 158 Ill. 103 [42 N.E. 178, 49 Am.St.Rep. 142, 29 L.R.A. 568]; *Davis* v. *City of Chicago,* 290 Ill.App. 244 [8 N.E.2d 378]; *Falender* v. *Atkins,* 186 Ind. 455 [114 N.E. 965]; *O'Brien* v. *Central Iron & Steel Co.,* 158 Ind. 218 [63 N.E. 302, 57 L.R.A. 508]; *Magdefrau* v. *Washington County,* 228 Iowa 853 [293 N.W. 574]; *Liddick* v. *City of Council Bluffs, supra; Highbarger* v. *Milford,* 71 Kan. 331 [80 P. 633]; *Burton* v. *Freund,* 243 Mich. 679 [220 N.W. 672]; *Dean* v. *Ann Arbor R. R.,* 137 Mich. 459 [100 N.W. 773]; *Vanderburgh* v. *City of Minneapolis,* 98 Minn. 329 [108 N.W. 480, 6 L.R.A.N.S. 741]; *Locascio* v. *Northern Pac. Ry. Co.,* 185 Minn. 281 [240 N.W. 661]; *In re Hull,* 163 Minn. 439 [204 N.W. 534, 205 N.W. 613, 49 A.L.R. 320]; *Lowell* v. *Buffalo County,* 123 Neb. 194 [230 N.W. 842, 242 N.W. 452]; *Mandell* v. *Board of Com'rs of Bernalillo County,* 44 N.M. 109 [99 P.2d 108]; *In re Grade Crossing Com'rs,* 210 App.Div. 328 [206 N.Y.S. 103], aff'd 240 N.Y. 612 [148 N.E. 727]; *In re William & North William Streets,* 103 Misc. 313 [171 N.Y.S. 116], aff'd 188 App.Div. 668 [177 N.Y.S. 318]; *Hiatt* v. *City of Greensboro,* 201 N.C. 515 [160 S.E. 748]; *Coy* v. *City of Tulsa,* 2 F.Supp. 411; *Atchison T. & S. F. Ry. Co.* v. *Terminal Oil Mill Co.,* 180 Okla. 496 [71 P.2d 617]; *Sandstrom* v. *Oregon-Washington R. & Nav. Co.,* 69 Ore. 194 [146 P. 803, 49 L.R.A.N.S. 889]; *Cooke* v. *City of Portland,* 136 Ore. 233 [298 P. 900]; *In re Vacation of Part of Melon Street,* 182 Pa. 397 [38 A. 482, 38 L.R.A. 275]; *Spang & Co.* v. *Commonwealth,* 281 Pa. 414 [126 A. 781]; *Hindes* v. *Allegheny County,* 123 Pa.Sup.Ct. 469 [187 A. 219]; *Johnsen* v. *Old Colony R. Co.,* 18 R.I. 642 [29 A. 594]; *Illinois Cent. R. Co.* v. *Moriarity,* 135 Tenn. 446 [186 S.W. 1053]; *City of Texarkana* v. *Lawson,* (Tex.Civ. App.) 168 S.W. 867; McQuillin, Municipal Corporations, [2d ed.] vol. 4, 276-278; secs. 1526-1527; Lewis on Eminent Domain, [3d ed.] vol. 1, 350-351, sec. 191; 16 Harv.L.Rev. 372; 39 YaleL.J. 128.) There are cases to the contrary (see 49 A.L.R. 330, 93 A.L.R. 639), but some of them are based upon

a constitutional provision which allows compensation for taking alone, no mention being made of a damaging. Many of them advance no sound reason for not permitting recovery, and arrive at the result with unenlightening phrases which furnish no real test. ▮▮▮ We do not fear that permitting recovery in cases of cul-de-sacs created in a municipality will seriously impede the construction of improvements, assuming the fear of such an event is real rather than fancied. The damage to the property owner is immediate and direct. The value of the use of the property is directly affected. To be able to get onto the street immediately in front of the property is of little value if that is as far as he can go. If he has access to the next intersecting street in both directions and one way is cut off, his easement, if it has any value to him at all, has certainly been impaired. We conclude, therefore, that the right of access extends in both directions to the next intersecting street.

Defendants contend that there are cases in California contrary to the foregoing views. In *Wolff* v. *City of Los Angeles,* 49 Cal.App. 400 [193 P. 862], the portion of the street which was graded was a considerable distance from plaintiffs' property and beyond an intersecting street, as was pointed out by this court in denying a hearing. In *City of San Mateo* v. *Railroad Commission,* 9 Cal.2d 1 [68 P.2d 713], it does not appear that the closing of the street placed the property owners on a cul-de-sac. Streets crossing the railroad right of way were closed, but it is said that as far as appears from the record the property abutted upon either a county road or state highway which paralleled the sides of the railroad. Moreover, it is pointed out that the property owners were not parties to a proceeding before the Railroad Commission and that the commission had ''not attempted to adjudicate such rights.'' The case was referred to and distinguished in *Rose* v. *State of California, supra,* at page 731. While that case may hold that grade crossings may be eliminated pursuant to the police power, we do not interpret it as holding that property may be placed in a cul-de-sac by the construction of a public improvement without the payment of compensation. Reference is made to *Bigley* v. *Nunan,* 53 Cal. 403, and *Brown* v. *Board of Supervisors,* 124 Cal. 274 [57 P. 82]. Neither of those cases involved a cul-de-sac. Both of them were concerned with a narrowing of the width of a street. (See *Hargro* v. *Hodgdon,* 89 Cal. 623 [26 P. 1106].) The Bigley case

is based upon the theory that the right of access is not peculiar and private to an abutting owner, which is out of harmony with *Rose* v. *State of California, supra,* at pages 727-728, and the authorities there cited. In the Brown case the only question before the court was whether the board of supervisors had the *power* to narrow the width of the street by virtue of its authority to close or vacate streets. The question of whether an action for damages under the Constitution would lie was not involved. The discussion apparently to the contrary of the views herein expressed was unnecessary. Indeed, the court, near the close of its opinion, quoted with approval from *Symons* v. *San Francisco,* 115 Cal. 555 [42 P. 913, 47 P. 453], where it was said: "Whether the order will have the effect to diminish the value of the plaintiffs' land, or to cause them damage, is not a ground for annulling the act of the board of supervisors, and cannot be considered in this proceeding. If the board of supervisors had the authority to pass the order, and the plaintiffs have sustained any legal damage by reason thereof, *they must seek relief in a direct proceeding therefor.*" (Emphasis added.)

Defendants contend that the creation of the cul-de-sac causes nothing more than mere circuity of travel which is not compensable, citing *Wolff* v. *City of Los Angeles, supra.* The inapplicability of that case has heretofore been discussed. In any event, the phrase "circuity of travel" has varied meanings and is frequently misused by the courts.

There is more than merely a diversion of traffic when a cul-de-sac is created. The ability to travel to and from the property to the general system of streets in one direction is lost. One might imagine many circumstances, as has been shown by defendants, in which recovery should not be permitted or where the reasons for recovery in the cul-de-sac cases might not be logically applied, but we are here concerned with the particular facts of this case and do not purport to declare the law for all cases under all circumstances.

The other items of damages claimed by plaintiff are not compensable. He asserts that all the residences, except his own, in a described area in which his property is situated were eliminated by defendants, and that a street railway formerly operating on Sterling Street has been removed. There is no property right appurtenant to plaintiff's property on Sterling Street which entitles him to the maintenance of

the residences or the continuous operation of the existing street railway. The removal of the residences and leaving the property vacant did not constitute a nuisance. It does not appear that the elevated road between plaintiff's property and Bryant Street in any way interferes with his access to the latter street or impairs any easement, if one exists, to light, air or view.

The judgment is reversed, and the court below is directed to permit the plaintiff to amend his complaint if he be so advised in conformity with the views herein expressed.

Gibson, C. J., Shenk, J., and Schauer, J., concurred.

EDMONDS, J.—I concur in the conclusion that the judgment against the property owner should be reversed, but for reasons different from those stated by my associates. And as the decision vitally affects the public interest in that it may largely determine whether highway improvements essential for modern transportation can be made without incurring liability for damages beyond the capacity of the state or a municipality reasonably to pay, I deem it appropriate to state the grounds upon which I believe the determination should rest.

When the government acts, either by way of legislation or by the exercise of any other legitimate means,[1] to promote the public health, safety, morals, and general welfare, a large area exists in which private interests may be restricted, impaired, or entirely destroyed by such action without compensation for the resulting loss or diminution in value of the property. (*Miller* v. *Schoene*, 276 U.S. 272 [48 S.Ct. 246, 72 L.Ed. 568]; *Bowditch* v. *Boston*, 101 U.S. 16 [25 L.Ed. 980]; *Omnia Commercial Co.* v. *United States*, 261 U.S. 502 [43 S.Ct. 437, 67 L.Ed. 773]; *Ex parte Hadacheck*, 165 Cal. 416 [132 P. 584, L.R.A. 1916B, 1248], affd. in *Hadacheck* v. *Sebastian*, 239 U.S. 394 [36 S.Ct. 143, 60 L.Ed. 348]; *Village of Euclid* v. *Ambler Realty Co.*, 272 U.S. 365 [47 S.Ct. 114, 71 L.Ed. 303]; *Northwestern Laundry* v. *Des Moines*, 239 U.S. 486 [36 S.Ct. 206, 60 L.Ed. 396]; *Sligh* v. *Kirkwood*, 237 U.S. 52 [35 S.Ct. 501, 59 L.Ed. 835]; *Reinman* v. *Little*

---

[1] ''The expression 'police power' is sometimes used in a very broad sense, including all legislation and almost every function of civil government.'' 11 Am.Jur., Constitutional Law, sec. 257, pp. 971, 972.

*Rock,* 237 U.S. 171 [35 S.Ct. 511, 59 L.Ed. 900].) This power of the government to act in furtherance of the public good without incurring liability for the resulting injury to private individuals is commonly known as the police power. It has been held many times that the Constitution supposes the pre-existence of the police power, and must be construed with reference to that fact. (*Chicago & N. W. R. Co.* v. *Illinois Commerce Com.,* 326 Ill. 625 [158 N.E. 376, 55 A.L.R. 654] ; *Borden* v. *Louisiana State Bd. of Education,* 168 La. 1005 [123 So. 655, 67 A.L.R. 1183] ; *Carthage* v. *Frederick,* 122 N.Y. 268 [25 N.E. 480, 19 Am.St.Rep. 490, 10 L.R.A. 178] ; *Re Morgan,* 26 Colo. 415 [58 P. 1071, 77 Am.St.Rep. 269, 47 L.R.A. 52] ; see 11 Am.Jur., Constitutional Law, sec. 245, p. 969.)

So far as the construction of improvements is concerned, however, even though their purpose be to promote and insure the public safety and convenience, the right of the State to take "private property" without the payment of "just" compensation, has been expressly forbidden by both the eminent domain provision of the state Constitution and the due process clause of the Fourteenth Amendment to the Constitution of the United States. (Cal. Const., art. I, sec. 14; *Chicago B. & Q. R. R. Co.* v. *Chicago,* 166 U.S. 226 [17 S.Ct. 581, 41 L.Ed. 979].) Obviously, under these provisions, if the State appropriates the land itself for a public use,. it is exercising its power of eminent domain with a corresponding liability to pay the owner the value of the land. And the amendment to the state Constitution entitling the owner to just compensation in cases where his property is "damaged," as well as when it is "taken," for the public use, indicates an intention to liberalize the policy of compensation in the area of consequential injury, as distinguished from an actual appropriation. (*Eachus* v. *Los Angeles Ry., supra,* p. 616; *Reardon* v. *San Francisco,* 66 Cal. 492, 501 [6 P. 317, 56 Am.Rep. 109] ; *Rigney* v. *City of Chicago, supra.*) The term "consequential damage," is used as meaning a diminution in value of land not actually acquired by the State, occasioned by the public improvement.

But it is uniformly recognized that not all consequential damage to private interests was intended to be included within the scope of the eminent domain clause. In the words of Mr. Justice Holmes in *Pennsylvania Coal Co.* v. *Mahon,*

260 U.S. 393, 412 [43 S.Ct. 158, 67 L.Ed. 322] : "Government hardly could go on if, to some extent, values incident to property could not be diminished without paying for every such change in the general law [as the Pennsylvania statute under consideration forbidding the mining of coal within 150 feet of the improved property of another]. . . . One fact for consideration in determining . . . [the] limits [of the police power] is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts." The court recognized that the question as to when compensation is required to be made for a diminution in value of private property under the eminent domain clause cannot be disposed of by general propositions; the problem is one "of degree." (p. 416.) Also this court, in *Rose* v. *State of California*, 19 Cal.2d 713, 737 [123 P.2d 505], held that the diminution in value of land occasioned by a public improvement diverting the main flow of traffic from in front of the premises is noncompensable. And the government may condemn private property and erect upon it a jail or "pest house" without compensating adjacent property owners for the undeniable impairment of their property values as a result of such public use. (See *Eachus* v. *Los Angeles etc. Ry.*, 103 Cal. 614, 617 [37 P. 750, 42 Am.St.Rep. 149]; *Rigney* v. *Chicago*, 102 Ill. 64, 80; *City of Winchester* v. *Ring*, 312 Ill. 544, 550-552 [144 N.E. 333, 36 A.L.R. 520]; *City of Geary* v. *Moore*, 181 Okla. 616 [75 P.2d 891], distinguishing *Oklahoma City* v. *Vetter*, 72 Okla. 196 [179 P. 473, 4 A.L.R. 1009].)

From these decisions it seems clear that a determination as to whether the diminution in value of land resulting from public improvement, as distinguished from a taking of the land itself for public use, falls within the scope of eminent domain necessitating the payment of compensation requires a consideration of the importance of the interest affected. (*State of California* v. *Marin Mun. W. Dist.*, 17 Cal.2d 699, 706 [111 P.2d 651].) In considering this problem, the court must weigh the relative interests of the public and the individual, so as to arrive at a just balance in order that government will not be unduly restricted in the proper exercise of its function for the public good, while at the same time giving due effect to the policy in the eminent domain clause of insuring the individual against an unreasonable loss occasioned

by the exercise of governmental power. In this connection, a distinction must be made between a diminution in value because of an act of a private individual and the decrease in value resulting from a public highway improvement. Obviously, the courts will be more ready to protect even the less important interests connected with the use of land against interference by private individuals whose acts have no public utility, than when the governmental power is exercised in behalf of a public improvement for the general welfare. Therefore, the fact that a particular interest has been protected against impairment by a private person does not necessarily mean that it is of sufficient importance, as against the state, to be included in the term "private property" within the meaning of the eminent domain clause of the Constitution. (See, for example, the discussion of the distinction between impairment of view by a private individual and by a proper highway improvement, in my dissenting opinion in *People* v. *Ricciardi, post,* p. 390 [144 P.2d 799].) The factors to be considered are, on the one hand, the magnitude of the damage to the owner of the land, and, on the other, the desirability and necessity for the particular type of improvement and the danger that the granting of compensation will tend to retard or prevent it. (*Pennsylvania Coal Co.* v. *Mahon, supra; Town of Windsor* v. *Whitney,* 95 Conn. 357, 366, 369 [111 A. 354, 12 A.L.R. 669]; *Davis* v. *County Commrs.,* 153 Mass. 218 [26 N.E. 848, 11 L.R.A. 750]; *Cram* v. *City of Laconia,* 71 N.H. 41 [51 A. 635, 57 L.R.A. 282]; *Richmond* v. *City of Hinton,* 117 W.Va. 223 [185 S.E. 411]; see 34 Columb.L.Rev. 938; 42 Columb.L.Rev. 596, 637; and see *Archer* v. *City of Los Angeles,* 19 Cal.2d 19, 23, 24 [119 P.2d 1]; *O'Hara* v. *L. A. County Flood etc. Dist.,* 19 Cal.2d 61, 63 [119 P.2d 23].)

In addition, before compensation may be denied, the court must find that the particular improvement is not unreasonably more drastic or injurious than necessary to achieve the public objective. (*Williams* v. *Los Angeles Ry. Co.,* 150 Cal. 592, 595, 596 [89 P. 330]; *Lane* v. *San Diego Elec. Ry. Co.,* 208 Cal. 29, 35 [280 P. 109]; *Town of Windsor* v. *Whitney, supra,* p. 369; *Maxwell* v. *Miami,* 87 Fla. 107 [100 So. 147, 33 A.L.R. 682]; and see note, 35 Columb.L.Rev. 938, 939; 11 Am.Jur., Constitutional Law, sec. 266, p. 1006.) Thus, if, in balancing these factors, the court decides that the interest

affected by the improvement which results in a diminution in the value of the land is of sufficient importance to require the payment of compensation under the eminent domain clause of the Constitution, it is not necessary to consider the improvement as a "damaging" of the land; since the interest is recognized as entitled to the protection of the law, it becomes a property right included in the term "private property" within the meaning of article I, section 14 of the state Constitution. In the event, however, that the interest is deemed of insufficient magnitude to warrant the payment of compensation under the eminent domain provision, it obviously is not "private property" within the scope of that clause, and the diminution in value of the land attributable to it, when affected by public improvement, falls within the area of uncompensated loss occasioned by the exercise of essential governmental power. *(Pennsylvania Coal Co. v. Mahon, supra,* see *Rose* v. *State of California, supra,* at p. 737.) And the Supreme Court of the United States has indicated that the recognition and definition of the interests in property included within the term "private property" are essentially matters which each state is permitted to determine for itself. (*Reichelderfer* v. *Quinn,* 287 U.S. 315, 319 [53 S.Ct. 177, 77 L.Ed. 331, 83 A.L.R. 1429]; *Sauer* v. *New York,* 206 U.S. 536, 548 [27 S.Ct. 686, 51 L.Ed. 1176].)

In balancing the necessity for a public improvement against the extent of damage sustained by an individual in order to determine the right to compensation, there need be no fear that individual rights will be unduly subordinated to the rights of society, for each claimed exercise of governmental power is subject to judicial examination as to whether the means exercised are reasonable, both in nature and extent. (*Town of Windsor* v. *Whitney, supra,* at p. 369.) And although the rule may be difficult to apply, it is not an arbitrary one. An analogous doctrine underlies a determination of the reasonableness of conduct in the law of negligence, which requires a court to weigh the magnitude of the risk involved in a particular act against its utility or the particular manner in which it is done. (2 Rest., Torts, sec. 291.) Obviously, as the judicial decisions on the subject increase in number, the result in a specific case may be predicted with increasing accuracy. (*Noble State Bank* v. *Haskell,* 219 U.S. 104 [31 S.Ct. 186, 55 L.Ed. 112].) One rule recently announced by

this court in approaching such a problem is that at least if the property owner would have no cause of action were a private person to inflict the damage, he can claim no compensation from the state. (*Archer* v. *City of Los Angeles, supra,* at p. 24.) But in the area of individual rights as yet uncharted by judicial decision, a court must weigh the interests affected in each case.

The question whether a property owner is entitled to compensation under the eminent domain clause of the California Constitution (art. I, sec. 14) when his property is placed in a cul-de-sac by the obstruction or vacation of one end of a street upon which the property abuts, but where the obstruction is not directly in front of the property, is one of first impression in California. Although an interference with the abutting owner's right of access in one direction only, but leaving a less convenient means of egress in another direction, has been held not to be a taking of private property within the prohibition of the due process clause of the Fourteenth Amendment to the federal Constitution (*Meyer* v. *City of Richmond,* 172 U.S. 82 [19 S.Ct. 106, 41 L.Ed. 199]), a majority of the courts which have considered the right of a property owner to damages, under the eminent domain clause of the jurisdiction, for being placed in a cul-de-sac have allowed recovery to those in the block where the obstruction occurs, even though one entrance to the block is left open. (*Felton* v. *State Highway Board,* 47 Ga.App. 615 [171 S.E. 198]; *City of Chicago* v. *Baker,* 39 C.C.A. 318 [98 F. 830]; *City of Chicago* v. *Burcky,* 158 Ill. 103 [42 N.E. 178, 49 Am. St.Rep. 142, 29 L.R.A. 568]; *Davis* v. *City of Chicago,* 290 Ill.App. 244 [8 N.E.2d 378]; *Falender* v. *Atkins,* 186 Ind. 455 [114 N.E. 965, 967]; *Highbarger* v. *Milford,* 71 Kan. 331 [80 P. 633]; *Burton* v. *Freund,* 243 Mich. 679 [220 N.W. 672]; *Vanderburgh* v. *City of Minneapolis,* 98 Minn. 329 [108 N.W. 480, 6 L.R.A.N.S. 741]; *Lowell* v. *Buffalo County,* 123 Neb. 194 [230 N.W. 842, 242 N.W. 452]; *Coy* v. *City of Tulsa,* 2 F.Supp. 411; *Atchison etc. Ry.* v. *Terminal Oil Mill Co.,* 180 Okla. 496 [71 P.2d 617]; *Sandstrom* v. *Oregon-Wash. R. & Nav. Co.,* 69 Ore. 194 [146 P. 803, 49 L.R.A.N.S. 889]; *In re Melon Street,* 182 Pa. 397 [38 A. 482, 38 A.L.R. 275]; *City of Texarkana* v. *Lawson,* (Tex.Civ.App.) 168 S.W. 867. Contra: *Kachele* v. *Bridgeport Hydraulic Co.,* 109 Conn. 151 [145 A. 756]; *Micone* v. *City of Middletown,* 110 Conn. 664

[149 A. 408] ; *Taylor* v. *Cooke,* 113 Conn. 162 [154 A. 349, 351] ; *Krebs* v. *Uhl,* 160 Md. 584 [154 A. 131], distinguishing *Johnson* v. *Mayor,* 148 Md. 432 [129 A. 648] ; *Smith* v. *Boston,* 61 Mass. 254; *Davis* v. *County Commrs.,* 153 Mass. 218 [26 N.E. 848, 11 L.R.A. 750] ; *Nichols* v. *Inhabitants of Richmond,* 162 Mass. 170 [38 N.E. 501] ; *Arcadia Realty Co.* v. *City of St. Louis,* 326 Mo. 273 [30 S.W.2d 995, 997] ; *Wilson* v. *Kansas City,* —— Mo. —— [162 S.W.2d 802] ; *Cram* v. *City of Laconia,* 71 N.H. 41 [51 A. 635, 57 L.R.A. 282] ; *New York etc. Ry.* v. *Bucsi,* 128 Ohio 134 [190 N.E. 562, 93 A.L.R. 632] ; *City of Bellevue* v. *Stedman,* 138 Ohio 281 [34 N.E.2d 769] ; *City of Lynchburg* v. *Peters,* 145 Va. 1 [133 S.E. 674] ; *Richmond* v. *City of Hinton,* 117 W.Va. 223 [185 S.E. 411].) But by the great weight of authority, as a matter of law, no compensation may be obtained because of an obstruction to or the vacation of a street in another block, even though the value of the complainant's property is substantially reduced thereby, and this regardless of whether the particular state Constitution requires compensation solely for property "taken" or "taken or damaged." (*City of East St. Louis* v. *O'Flynn,* 119 Ill. 200 [10 N.E. 395, 59 Am.Rep. 795] ; *Buhl* v. *Fort St. Union Depot Co.,* 98 Mich. 596 [57 N.W. 829, 23 L.R.A. 392] ; *Locascio* v. *Northern Pac. Ry. Co.,* 185 Minn. 281 [240 N.W. 661] ; *In re Hull,* 163 Minn. 439 [204 N.W. 534, 538-540, 205 N.W. 613, 49 A.L.R. 320] ; *Chicago etc. Ry.* v. *Prigmore,* 180 Okla. 124 [68 P.2d 90] ; *Cooke* v. *City of Portland,* 136 Ore. 233 [298 P. 900] ; *Spang & Co.* v. *Commonwealth,* 281 Pa. 414 [126 A. 781] ; *Hindes* v. *Allegheny County,* 123 Pa.Sup.Ct. 469 [187 A. 219] ; *Hyde* v. *Minnesota etc. Ry.,* 29 S.D. 22 [136 N.W. 92, 99, 40 L.R.A.N.S. 48] ; *Lee* v. *City of Stratford* [Tex.Com.App., adopted by Supr. Ct.], 125 Tex. 179, 81 S.W.2d 1003; *City of El Paso* v. *Sandfelder,* (Tex. Civ.App.) 118 S.W.2d 950; *Jackson* v. *Birmingham etc. Co.,* 154 Ala. 464 [45 So. 660] ; *Whitsett* v. *Union Depot & R. Co.,* 10 Colo. 243 [15 P. 339] ; *Jarnagin* v. *Louisiana Highway Com.,* (La.App.) 5 So.2d 660; *Mandell* v. *Board of Commrs. of Bernalillo Co.,* 44 N.M. 109 [99 P.2d 108] ; *Sanders* v. *Town of Smithfield,* 221 N.C. 166 [19 S.E.2d 630] ; *Chicago & N. W. Ry.* v. *Railroad Com.,* 167 Wis. 185 [167 N.W. 266].)

The question immediately arises as to the reason, if any, for such a distinction. What are the factors which have induced courts to recognize the damage of one owner as com-

pensable and that of another as noncompensable when the diminution in value of the properties of both is occasioned by the same public act? So far as the mere inconvenience of traveling any additional distance necessitated by the inability longer to use the obstructed street is concerned, no compelling reason for such a distinction is warranted by logic, as it is difficult to justify the denial of compensation to one whose property is located directly across the first intersecting street while allowing recovery to the person owning the lot on the corner of the block in which the cul-de-sac exists. And because many of the courts have confined consideration of the damage caused by the obstruction to what they term the necessity for "circuity of travel," the conclusion that the allowance of recovery should not be extended to the whole neighborhood with a probable throttling of public improvements, has influenced a substantial number of them to deny compensation altogether. (*Dantzer* v. *Indianapolis Union Ry.*, 141 Ind. 604 [39 N.E. 223, 50 Am.St.Rep. 343, 34 L.R.A. 769]; *Nichols* v. *Inhabitants of Richmond*, (Mass.) *supra; Cram* v. *City of Laconia*, (N.H.) *supra; Henry L. Doherty & Co.* v. *Joachim*, 146 Fla. 50 [200 So. 238].) Also some decisions which follow the majority view have treated recovery in a cul-de-sac case as an exception to the rule generally announced that circuity of travel occasioned by a proper highway improvement, or regulation, is a noncompensable item of damage.

But the traveling of additional distances occasioned by modern traffic engineering to make travel more safe and to adapt the highway system to the adequate disposal of the increasingly heavy burden of automobile traffic—as, for example, by the construction of divided highways for various types of traffic, or the re-routing of traffic by one-way regulations or the prohibition of left-hand turns—is an element of damage for which the property owner may not complain in the absence of arbitrary action. (*City of San Mateo* v. *Railroad Com.*, 9 Cal.2d 1, 9, 10 [68 P.2d 713]; see note 100 A.L.R. 487, 491-493.) It is, therefore, not surprising that many courts have refused compensation in cul-de-sac cases because of the similarity in problems so far as the question of circuity is concerned. And, therefore, in testing the merits of the majority rule, mere "circuity of travel," in the sense that it refers to the additional distance required to be tra-

versed because of a proper highway construction, should not be used to justify the allowance of compensation to the owner abutting upon the street in the block where the obstruction exists.

There is a material difference, however, between the situation of the property owner in the block where one end of the street is obstructed and that of the persons whose lots abut on the same street beyond the first intersection. Whereas formerly he had an outlet at both ends of the street on which his lot fronts, after the obstruction, he has but one. This is obviously not true of the landowners beyond the first intersection, for they still have access in either direction.

But, it may be asked, of what practical significance is this distinction, so far as damage to the property owner is concerned? If, for example, the land is used for business or industrial purposes, the fact that it is in a block where the street terminates may seriously affect the easement of access, in considering the full and beneficial use of the property. All vehicles entering the block must either turn around or back out in order to leave it, to this extent impairing the right of egress. In the case of trucks or other large vehicles, such a requirement may substantially interfere with the highest and best use of the property. (See *Cartmell* v. *City of Marysville*, 231 Ky. 666 [22 S.W.2d 102, 104].) And the owner of a lot so located is more adversely affected than is one whose property abuts upon a street restricted to one-way traffic, for in the latter case free ingress and egress is possible.

Yet, even though the interference with the use of the land within the block where the cul-de-sac is created is materially greater than that of the property beyond the first intersection upon the same street, the question remains whether the owner's access to his property is so materially affected as to warrant the payment of compensation under the eminent domain provision of the California Constitution.

The necessity for arterial freeways, uninterrupted by numerous intersections, in order to dispose of vehicular traffic safely and efficiently is a matter of growing public concern. Allowance of damages to the property owners on each street formerly crossing a highway which is to be rebuilt for the requirements of fast moving or interurban traffic for a distance of a few or many miles, even if confined to one block on each side of the freeway, might prove so burdensome as to stop or substantially decrease needed improvements. (See

*Davis* v. *County Commrs.* [Mass.], *supra,* at p. 850; *Cram* v.
*City of Laconia* [N. H.], *supra; Richmond* v. *City of Hinton*
[W. Va.], *supra;* 13 Va. L. Rev. 334-337.) It must be remem-
bered also that to the amount of damages awarded must be
added the probable expense of defending hundreds of suits.
At the same time, however, in view of the policy underlying
the eminent domain provision of the Constitution, the court
must give adequate recognition to the hardship to the indi-
vidual in a block ending in a dead end, materially affecting,
as the obstruction does, the right of egress from his property.
In addition, the possibility of locating and constructing the
improvement in such a way as to leave the property owner
with a way out in each direction along the street upon which
he abuts has a direct connection with the limitation that, in
order to avoid liability for compensation, the placement of
the improvement and its manner of construction must not
be unreasonably more drastic or injurious than is reasonably
required to achieve the necessary end. For example, ordi-
narily, in constructing an arterial freeway the objectives of
the project may be served and a method of egress provided
for property owners by the construction of local service roads,
paralleling the main freeway, into which the traffic from the
side streets may pass and enter or cross the freeway at loca-
tions consistent with safety. (See *People* v. *Ricciardi, post.*)
Were the construction of such service roads to be approved
as a proper use. of the land owned by the state for highway
purposes without subjecting the state to liability to abutting
property owners for such improvements, the cost of such
service roads would constitute a definitely ascertainable item,
thus obviating the uncertainty in estimating in advance the
damages to the property owners, were the streets to be termi-
nated so as to create cul-de-sacs. Under such circumstances,
where governing authorities fail or refuse to include such
service roads as a part of the project, or in the relatively few
situations where their construction is not possible, the dam-
age sustained by the individual should be borne by the pub-
lic. But the majority opinion in the Ricciardi case, by creat-
ing a cause of action in every property owner abutting upon
the lane constructed for local traffic along the route of an
arterial highway, certainly offers no inducement to the state
to include such features in highway improvements, and makes
the balancing of the respective interests of the public and
the land owner a close question. However, because circum-

stances readily can be visualized where, after a block is closed at one end, the owner's access to his property from the street may be as effectively blocked as though an obstruction were placed directly in front of his premises,[1] in my opinion the question of compensable impairment of ingress and egress should be left for the trier of fact to determine.

But in ascertaining the amount of damage arising from the impairment of the easement of access, the jury may consider only compensable elements of injury, relating to the interference with the ingress to and egress from the property insofar as it affects the uses to which the property is adaptable. Such elements as the additional distance which one is required to travel upon the public street in order to reach the property and the divergence of travel occasioned by the highway improvements should be excluded from the testimony of the witnesses and the consideration of the jury. (*People* v. *Ricciardi, supra; Rose* v. *State of California, supra,* at p. 737; *Dantzer* v. *Indianapolis Union Ry., supra; Grigg Hanna Lumber, etc., Co.,* v. *Van Wagoner,* 294 Mich. 346 [293 N.W. 675, 678-679]; *Tomaszewski* v. *Palmer Bee Co.,* 223 Mich. 565 [194 N.W. 571]; *Atchison etc. Ry.* v. *Terminal Oil Mill Co.* (Okla.), *supra,* at p. 619; *Chicago etc. Ry.* v. *Prigmore* (Okla.), *supra,* at pp. 91, 92; *Henry L. Doherty & Co.* v. *Joachim* (Fla.), *supra; Canady* v. *Coeur D'Alene Lumber Co.,* 21 Idaho 77 [120 P. 830]; *Jarnagin* v. *La. Highway Com.* (La. App.), *supra; Sanders* v. *Town of Smithfield* (N.C.), *supra,* at p. 634; *Chicago & N. W. Ry.* v. *Railway Com.* (Wis.), *supra.*)

CURTIS, J.—I agree with the conclusion reached in the majority opinion on the ground expressed in the concurring opinion.

TRAYNOR, J.—I dissent.

The majority opinion declares that the allowance of recovery to the owner in this case "depends largely upon the character and extent of his property right." It seeks such a right in the right of ingress and egress which, it declares, "being by its terms general in nature requires definition and

---

[1]For example, a truck which formerly entered the street, stopped in front of the landowner's industrial premises, and then, in leaving, continued along the street in the same direction, may, because of the width of the street, be unable to turn around in it after one end is blocked, and for that reason, be unable to use the street for access to the land.

clarification as to its extent and character." What follows is a definition amplifying that right to make it a basis for recovery in the present case in terms of the invasion of property rights. As there is no invasion of traditional rights, a new right is created by the simple process of redefinition. The frontiers of the right of ingress and egress are thus freely advanced to make the very recovery in question a foregone conclusion.

The real basis of the decision must be found in the considerations that moved the majority to grant recovery. The key to those considerations lies in the statement in the majority opinion that "If the question is one of first impression its answer depends chiefly upon matters of policy, a factor the nature of which, although at times discussed by the courts, is usually left undisclosed." By way of revelation in the present case, the opinion goes on to declare that "on the one hand the policy underlying the eminent domain provision in the Constitution is to distribute throughout the community the loss inflicted upon the individual by the making of public improvements . . . On the other hand, fears have been expressed that compensation allowed too liberally will seriously impede, if not stop, beneficial public improvements because of the greatly increased cost . . . In some degree those opposed policies are manifested in the conflict between the constitutional mandate that compensation would be paid when private property is taken or damaged for a public purpose and the exercise of the police power where compensation need not be paid."

One is led to expect that the solution of the problem will lie in the weighing of these two policies, but it is not clear that the majority arrives at its solution in this manner. A review of the facts is summarily followed by the rule for which the case now stands: "It would seem clear that the reasonable modes of egress and ingress embrace access to the next intersecting street in both directions. It should be noted that the right is more extensive than the mere opportunity to go on to the street immediately in front of the property." Having thus reached its conclusion without stating why one policy outweighed the other, the opinion suggests that it balanced policies with the aid of precedents. "We are not confronted with the necessity of balancing the conflicting policies heretofore referred to without the aid of persuasive precedent." It is thus left in doubt whether the weighing of poli-

cies or the persuasive precedents served as the basis of the opinion. There is an intimation that it was the latter in the statement: "Many authorities and writers have either declared or intimated that the creation of a cul-de-sac, that is, the blocking of access to the next intersecting street in one direction is compensable, although the access still exists in the opposite direction to an intersecting street. In other words, the easement is to that extent." A list of cases from other states, together with citations to texts and law reviews is appended to support this statement.[1] The conclusion is first reached and then justified in a manner that suggests a weighing of policies: "We do not fear that permitting recovery in cases of cul-de-sacs created in a municipality will seriously impede the construction of improvements, assuming the fear of such an event is real rather than fancied. The damage to the property owner is immediate and direct. The value of the use of the property is directly affected. To be able to get onto the street immediately in front of the property is of little value if that is as far as he can go. If his access to the next intersecting street in both directions and one way is cut off, his easement, if it has any value to him at all, has certainly been impaired. We conclude, therefore, that the right of access extends in both directions to the next intersecting street." Being more concerned with the reduction in value of plaintiff's property than with the fear that the allowance

---

[1]There are also persuasive precedents against this conclusion: *Meyer v. Richmond*, 172 U.S. 82 [19 S.Ct. 106, 41 L.Ed. 199]; *New York C. & St. L. R. Co. v. Bucsi*, 128 Ohio St. 134 [190 N.E. 562]; *City of Bellevue ex rel. Vickery v. Stedman*, 138 Ohio St. 281 [34 N.E.2d 769]; *Davis v. County Commissioners*, 153 Mass. 218 [26 N.E. 848, 11 L.R.A. 750]; *Nichols v. Inhabitants of Richmond*, 162 Mass. 170 [38 N.E. 501]; *Warner v. New York, N. H. & H. R. Co.*, 86 Conn. 561 [86 A. 23]; *Cram v. City of Laconia*, 71 N.H. 41 [51 A. 635, 57 L.R.A. 282]; *Kachele v. Bridgeport Hydraulic Co.*, 109 Conn. 151 [145 A. 756]; *Micone v. City of Middletown*, 110 Conn. 664 [149 A. 408]; *Taylor v. Cooke*, 113 Conn. 162 [154 A. 349]; *Krebs v. Uhl*, 160 Md. 584 [154 A. 131]; *Chicago & N. W. Ry. Co. v. Railroad Com.*, 167 Wis. 185 [167 N.W. 266]; *Arcadia Realty Co. v. City of St. Louis*, 326 Mo. 273 [30 S.W.2d 995]; *Wilson v. Kansas City*, —— Mo. —— [162 S.W.2d. 802]; *City of Lynchburg v. Peters*, 145 Va. 1 [133 S.E. 674]; *Jarnagin v. Louisiana Highway Com.*, (La.App.) 5 So.2d 660; *Powell v. McKelvey*, 56 Idaho 291 [53 P.2d 626]; *Kemp v. City of Seattle*, 149 Wash. 197 [270 P. 431]; *Ponischil v. Hoquiam Sash & Door Co.*, 41 Wash. 303 [83 P. 316]; *City of Fort Smith v. Van Zandt*, 197 Ark. 91 [122 S.W.2d 187]; *Ralph v. Hazen*, 68 App.D.C. 55 [93 F.2d 68]; *Freeman v. City of Centralia*, 67 Wash. 142 [120 P. 886, Ann.Cas. 1913D 786]; *Richmond v. City of Hinton*, 117 W.Va. 223 [185 S.E. 411]; *Olsen v. Jacobs*, 193 Wash. 506 [76 P.2d 607]; *De Rossette v. Jefferson County*, 288 Ky. 407 [156 S.W.2d 165].

of recovery will impede improvements, the majority allows recovery and thus creates the property right.

It is implicit in the majority opinion, however, that such a property right was already inherent in the right, admittedly of obscure origin, of ingress and egress. The opinion states that in spite of the policy not to impede beneficial improvements "the courts cannot ignore sound and settled principles of law safeguarding the rights and property of individuals." It also states, after describing the cul-de-sac in the present case, "that plaintiff's property has been damaged by the impairment cannot be here questioned." The statement that "If he has access to the next intersecting street in both directions and one way is cut off, his easement, if it has any value to him at all, has certainly been impaired" assumes that plaintiff's easement embraces the right in question.

Whether the majority opinion allows recovery on the ground that there has been an impairment of a property right inhering in the right of ingress and egress or on the ground that such a right should now be judicially created, I cannot subscribe to it.

The basic question in this appeal is whether the property that plaintiff alleged was taken or damaged existed at all. If the abutting owner has an easement in the street longitudinally to the next intersection in each direction, compensation must be paid for the impairment of that easement. (See *United States* v. *Welch*, 217 U. S. 333, 339 [30 S.Ct. 527, 54 L.Ed. 787].) If he does not have such an easement he can have no recovery even though the value of the abutting property may be diminished as a result of the improvement. (*Reichelderfer* v. *Quinn*, 287 U. S. 315, 319 [53 S.Ct. 177, 77 L.Ed. 331, 83 A.L.R. 1429]; *Eachus* v. *Los Angeles etc. Ry. Co.*, 103 Cal. 614, 617 [37 P.750, 42 Am.St.Rep. 149]; *Rose* v. *State of California*, 19 Cal. 2d 713, 737, 744 [123 P.2d 505]; *Rigney* v. *Chicago*, 102 Ill. 64, 80; *City of Winchester* v. *Ring*, 312 Ill. 544, 550, 552 [144 N.E. 333, 36 A.L.R. 520], 118 A.L.R. 921.)

There is nothing in the history of the right of ingress and egress to indicate that it embraces any such easement. The right of ingress and egress is a creation of judicial decision.[1]

---

[1] The origin of the whole doctrine of abutters' rights is graphically described in the dissenting opinion of Mr. Justice Holmes in *Muhlker* v. *New York and H. R. R. Co.*, 197 U.S. 544, 572 [25 S.Ct. 522, 49 L.Ed. 872]: "The plaintiff's rights, whether expressed in terms of property or of con-

(See *Crane* v. *Hahlo*, 258 U.S. 142 [42 S.Ct. 214, 66 L.Ed. 514].) Its operation as a limitation on street improvements by municipalities and public utilities originated in the New York elevated railway cases. In the leading case of *Story* v. *New York Elevated Railway Co.*, 90 N.Y. 122 [43 Am.Rep. 146], an injunction was sought to restrain the erection of an elevated railway in the street on which plaintiff's property abutted. The court held that the use of the street for elevated railway purposes was inconsistent with the use of the right of way for street purposes. The city had subdivided the land originally, laid out the streets and lots, and conveyed the land by deeds containing a covenant that the streets shown on the maps should forever remain open as public streets and ways. The court cited the ordinary rule that a grantor making a conveyance that refers to a map showing streets cannot divert the lands to any use inconsistent with the normal uses of the street. The court held that this rule applied to the city in its role as subdivider. In *Lahr* v. *Metropolitan Elevated Railway Co.*, 104 N.Y. 268 [10 N.E. 528], however, the court held that even where the abutters did not derive their title from the city and had no express covenant, such as existed in the Story case, they nevertheless had an easement of access to the street. The basis of the decision was that under the New York statutes whereby streets were opened a trust was created for the benefit of the public at large and also for the benefit of abutting owners. The court held that an easement of access was implicit in the trust. Later, however, it took care to hold that the abutting owner's rights are subordinate to any reasonable use of the street made by public

---

tract, are all a construction of the courts, deduced by way of consequence from dedication to and trusts for the purposes of a public street. They never were granted to him or his predecessors in express words, or, probably, by any conscious implication. If at the outset the New York courts had decided that, apart from statute or express grant, the abutters on a street had only the rights of the public and no private easement of any kind, it would have been in no way amazing. It would have been very possible to distinguish between the practical commercial advantages of the expectation that a street would remain open and a right *in rem* that it would remain so. . . . But again, if the plaintiff had an easement over the whole street he got it as a tacit incident of an appropriation of the street to the uses of the public. . . . It was possible for the New York courts to hold, as they seem to have held, that the easement which they had declared to exist is subject to the fullest exercise of the primary right out of which it sprang, and that any change in the street for the benefit of public travel is a matter of public right, as against what I have called the parasitic right which the plaintiff claims."

authorities to facilitate general travel. (*Reining* v. *New York L. & W. R. Co.*, 128 N.Y. 157 [28 N.E. 640, 14 L.R.A. 133]; *Rigney* v. *New York C. & H. Co.*, 217 N.Y. 31 [111 N.E. 226].) Presumably the public right to use the street was reserved if the city subdivided and sold the lots in the street; conversely compensation for the normal uses of the street was paid if the street or highway was condemned or conveyed. (See *Davis* v. *County Commissioners*, 153 Mass. 218 [26 N.E. 848, 850, 11 L.R.A. 750]; 13 Va.L.Rev. 334.) While the normal uses of the street are bound to change with the times, the streets are invariably characterized as public rights of way.

In *Eachus* v. *Los Angeles Railway Co.*, 103 Cal. 614 [37 P. 750, 42 Am.St.Rep. 149], upon which plaintiff relies heavily, the city had likewise subdivided and sold the property owned by the plaintiffs. California, like New York, later extended abutters' easements to cases where title was not derived from the city.

The trust that arises from the appropriation of land for public thoroughfares is for the benefit of the public at large and only incidentally for the benefit of abutting owners. The extension of the abutting owner's rights in the present case makes the primary consideration the benefit of abutting owners rather than the benefit of the public. Hitherto no California case has ever defined the right of ingress or egress as inclusive of an easement to the next intersecting street. The rule has been that the right of ingress and egress is limited to adequate and reasonable access to the property from the street, that it does not extend to the full width of the street, or to the full length thereof, or even to all points upon the street in front of the abutting property. It is sufficient if there is access to a street that in turn connects with the general street system. Any improvement that does not materially interfere with such access does no compensable damage. The California Vehicle Code and city traffic ordinances abound with regulations that limit a property owner's freedom of movement upon the street on which his property abuts. Thus "U" turns or the making of left turns upon emerging from a building or private driveway are frequently prohibited, and the diversion of traffic into one-way streets is common. Frequently traffic moving in opposite directions is separated by some physical barrier such as a raised curbing. These re-

strictions have the same effect whether they ensue from traffic regulations or physical obstructions and there is no more reason to allow compensation because of the resulting diminution in property values or the inconvenience of circuity of travel in the one case than in the other.

. The newly created property right in this case is inconsistent not only with the trust from which the right of ingress and egress is derived, but with the established rule in this state and others that street improvements give rise to no compensable damage if there is no injury to the abutting owner different in kind from that suffered by other property owners and the general public. This rule is repudiated in the majority opinion: "If he has a property right and it has been impaired, the damage is necessarily peculiar to himself and is different in kind than that suffered by him as a member of the public generally for his particular right as a property owner and not as a member of the public has been damaged." This statement draws its conclusion from an assumption of the very thing to be proved. The question is whether or not the owner has a property right that has been impaired, and it cannot be assumed that he has without drawing a line between his property and all the other property in the community. When the majority opinion draws the line at the next intersection it arbitrarily attaches a right to abutting property in one block on the street, but not to abutting property on the same street in the next block or to property abutting on neighboring streets, even though they may likewise be diminished in value as a result of the improvement and the owners may be similarly inconvenienced by circuity of travel. Recovery therefore depends upon the accident of location.[1]

. Whatever difficulties may arise in applying the rule requir-

[1]The concurring opinion attempts to draw a distinction between abutting owners in the block on which the obstruction exists and other owners, on the ground that "All vehicles entering the block must either turn around or back out in order to leave it." This inconvenience is not essentially different from the inconvenience of circuity of travel, and it is not compensable for the very reasons advanced in the concurring opinion with regard to circuity of travel. (See also *Jones Beach Boulevard Estates* v. *Moses*, 268 N.Y. 362 [197 N.E. 313, 100 A.L.R. 487]; *Ralph* v. *Hazen*, 68 App.D.C. 55 [93 F.2d 68, 71]; *City of Fort Smith* v. *Van Zandt*, 197 Ark. 91 [122 S.W.2d 187].) It is commonplace in the operation of motor vehicles to turn around on streets or back out therefrom just as it is to back out from property where there is no space for turning the vehicles. The right of ingress and egress is no more impaired in such situations than on a one-way street or divided highway where one cannot turn around or back out.

ing proof of special damage to the facts of a particular case (see *Cram* v. *City of Laconia,* 71 N.H. 41 [51 A. 635, 636, 57 L.R.A. 282]), it is an objective standard that has become a rule of property over the years. It should not be abandoned merely to be replaced by the subjective judgment of a majority of this court that singles out particular owners for compensation because of the diminution in the value of their property and the inconvenience of circuity of travel.

It has long been established that an injury is not peculiar to the abutting property merely because the improvement causes a diminution in the value of the property. (*Eachus* v. *Los Angeles Ry. Co.,* 103 Cal. 614, 617 [37 P. 750, 42 Am. St.Rep. 149].) The rule is forcefully stated by Mr. Chief Justice Stone in *Reichelderfer* v. *Quinn,* 287 U.S. 315, 319 [53 S.C. 177, 77 L.Ed. 331, 83 A.L.R. 1429] : "But the existence of value alone does not generate interests protected by the Constitution against diminution by the government, however unreasonable its action may be. The beneficial use and hence the value of abutting property is decreased when a public street or canal is closed or obstructed by public authority, *Meyer* v. *Richmond,* 172 U.S. 82, 95 [19 S.Ct. 106, 41 L.Ed. 199] ; cf. *Whitney* v. *New York,* 96 N.Y. 240; *Fox* v. *Cincinnati,* 104 U.S. 783 [26 L.Ed. 928] ; *Kirk* v. *Maumee Valley E. Co.,* 279 U.S. 797, 802, 803 [49 S.Ct. 507, 73 L.Ed. 963] ; *Smith* v. *Boston,* 7 Cush. (Mass.) 254; *Stanwood* v. *Malden,* 157 Mass. 17 [31 N.E. 702, 16 L.R.A. 591], or a street grade is raised, *Smith* v. *Washington,* 20 How. (U.S.) 135 [15 L.Ed. 858] ; see *Mead* v. *Portland,* 200 U.S. 148, 162 [26 S.Ct. 171, 50 L.Ed. 413] or the location of a county seat, *Newton* v. *Commissioners, supra* [100 U.S. 548 (25 L.Ed 710)] or of a railroad is changed. (*Bryan* v. *Louisville & N. R. Co.,* 157 C.C.A. 98 [244 F. 650, 659].) But in such cases no private right is infringed.

"Beyond the traditional boundaries of the common law only some imperative justification in policy will lead the courts to recognize in old values new property rights. . . . The case is clear where the question is not of private rights alone, but the value was both created and diminished as an incident of the operations of the government. For if the enjoyment of a benefit thus derived from the public acts of government were a source of legal rights to have it perpetuated, the powers of government would be exhausted by their exericse."

In holding that owners of land adjacent to a public park had no easement in the park and therefore no claim to recovery because of the erection of a fire-engine house in the park that reduced the value of neighboring property, Mr. Chief Justice Stone declared: "The abutting owner cannot complain; the damage suffered by him 'though greater in degree than that of the rest of the public, is the same in kind.'" (See, also, *Eachus* v. *Los Angeles etc. Ry. Co.*, 103 Cal. 614, 617 [37 P. 750, 42 Am.St.Rep. 149]; *Rose* v. *State of California*, 19 Cal.2d 713, 737, 744 [123 P.2d 505]; *People* v. *Gianni*, 130 Cal.App. 584, 586 [20 P.2d 87]; *City of Stockton* v. *Marengo*, 137 Cal.App. 760 [31 P.2d 467]; *Levee Dist. No. 9* v. *Farmer*, 101 Cal. 178 [35 P. 569, 23 L.R.A. 388].)

The application in numerous cases in this state of the rule requiring a showing of special damages has established the law that if an obstruction cuts off the owner's access from his premises to the street, he has suffered a special injury. (See *Rose* v. *State of California*, 19 Cal.2d 713 [123 P.2d 505]; *Eachus* v. *Los Angeles etc. Ry. Co.*, 103 Cal. 614 [37 P. 750, 42 Am.St.Rep. 149]; *McCandless* v. *City of Los Angeles*, 214 Cal. 67 [4 P.2d 139]; *Lane* v. *San Diego Elec. Ry. Co.*, 208 Cal. 29 [280 P. 109]; *Wilcox* v. *Engebretson*, 160 Cal. 288 [116 P. 750]; *Williams* v. *Los Angeles Ry. Co.*, 150 Cal. 592 [89 P. 330]; *Geurkink* v. *City of Petaluma*, 112 Cal. 306 [44 P. 570]; *Bigelow* v. *Ballerino*, 111 Cal. 559 [44 P. 307].) It has also established the law that the inconvenience of circuity of travel does not call for compensation (see 49 A.L.R. 333; 93 A.L.R. 639), and that any inconvenience to the owner after he is on the street and wishes to travel over the system of public streets is a damage suffered in common with the general public and does not constitute an impairment of his easement. Thus, in *Bigley* v. *Nunan*, 53 Cal. 403, 404, the defendant, by the construction of a fence, occupied one-half of the public street immediately in front of plaintiff's property but on the opposite side of the street therefrom. The fence shut off completely one-half of the street width in front of plaintiff's property. The plaintiff sued the defendant to abate the nuisance, and for damages. The court held that if there was a nuisance it was a public one, and that a private person could not bring an action to abate a public nuisance unless he could show damage to himself or his property that was peculiar to him as distinguished from

damage to the public. The court held that the plaintiff could not make such a showing under the alleged facts, declaring: "The access from plaintiff's lot to the street has not been cut off or impeded, and if plaintiff and his immediate neighbors have more occasion to pass through the street than the public at large, this is an inconvenience in degree only, and is not an injury in *kind* different from that sustained by the public." The narrowing of a street by one-half immediately opposite a lot, is in principle no different from the closing of the street in one direction with access left unimpeded in the other.

In *Reynolds* v. *Presidio etc. R. R. Co.*, 1 Cal.App. 229 [81 P. 1118], the complaint alleged that the laying of streetcar tracks near the boundary of plaintiff's property has "obstructed ingress to and from said property." In denying damages the court said: "There is no allegation that the obstruction prevents the plaintiff from having access to and from her property. . . . Such obstruction clearly would not prevent the plaintiff from getting on or off her lot to the public street."

Where, however, the obstruction cuts off access to the street an injury results that is peculiar to the property and different in kind from that suffered by the general public. The distinction is forcefully brought out in *Hargro* v. *Hodgdon*, 89 Cal. 623, 628 [26 P. 1106]. In that case the defendant constructed on a public alleyway a building that occupied the whole alley along the plaintiff's property line. The court affirmed an order enjoining the maintenance of the building. After approving the doctrine that the obstruction of a public highway of itself does not constitute a special injury to an abutting property owner, the court stated: "But it has never been held that an individual can not maintain an action to abate an obstruction which, while obstructing the public highway, also cuts off access from his premises to the public highway. So far as it does this, it becomes a private nuisance. His complaint is, not that it obstructs the street or road, but that it prevents him from reaching it." (See, also, *Schaufele* v. *Doyle*, 86 Cal. 107 [24 P. 834] ; *Strong* v. *Sullivan*, 180 Cal. 331 [181 P. 59, 4 A.L.R. 343] ; *Williams* v. *Los Angeles Ry. Co.*, 150 Cal. 592, 594 [89 P. 330].)

In *Hitch* v. *Scholle*, 180 Cal. 467 [181 P. 657], the complaint alleged that the plaintiff owned certain land subject to an easement of way in the public and that the defendant

obstructed this public highway by building and maintaining a fence across it and threatened to plow up the highway. The court denied an injunction, declaring: "It is well settled that if an obstruction which is wrongfully erected and maintained in a public highway constitutes a nuisance which injuriously affects a private person equally in common with the public at large, a private action may not be maintained to abate the nuisance. (*Blanc* v. *Klumpke,* 29 Cal. 156.) It is only where the free use of the property of a private person is interfered with by such an obstruction that he may have his private action to abate the nuisance resulting therefrom . . . there is no ground for an action by a private person to abate a public nuisance resulting from the obstruction of a public highway where it merely appears that the person would be subjected to personal inconvenience by the obstruction or placed under the necessity of traveling by a much more circuitous route to reach his destination." (180 Cal. 467, 468, 470; see, also, 2 Wood on Nuisances, 853, sec. 645; 42 Columb. L. Rev. 596, 613; 4 Rest., Torts, 216 et seq.)

While these are nuisance cases they are directly in point, for an action to enjoin a public nuisance cannot be maintained unless it constitutes an injury to a private right. It is established that a property right must be invaded before compensation is allowed under article I, section 14 of the California Constitution. The constitutional provision creates no property rights; it protects those that already exist. That which was *damnum absque injuria* before the adoption of the "or damaged" clause is still *damnum absque injuria.* "The provision (art. I, sec. 14) permits an action against the state, which cannot be sued without its consent. It is designed, not to create new causes of action, but to give a remedy for a cause of action that would otherwise exist. The state is therefore not liable under this provision for an injury that is *damnum absque injuria.* If the property owner would have no cause of action were a private person to inflict the damage, he can have no claim for compensation from the state." (*Archer* v. *City of Los Angeles,* 19 Cal.2d 19, 24 [119 P. 2d 1].)

The rule, however, is not derived solely from the nuisance cases. Thus in *Brown* v. *Board of Supervisors,* 124 Cal. 274 [57 P. 82], the San Francisco Board of Supervisors passed an order providing for the reduction in the width of Turk

Street from 100 feet to 68 feet 7 inches. The abutting owners claimed that the improvement could not be made without providing compensation for the damage the improvement would cause their property. In sustaining a demurrer to their petition for certiorari the court declared: "The property which an abutting owner has in the street in front of his land is the right of access and of light and air, and for an infringement of these rights he is entitled to compensation. This right is peculiar and individual to the abutting owner, differing from the right of passing to and fro upon the street, which he enjoys in common with the public, and any infringement thereof gives him a right of action. . . . The appellants herein do not, however, claim that the reduction in the width of the street will in any respect interfere with their enjoyment of light and air, or that access to their lots is in any degree impaired. Indeed, in view of the fact that by the proposed reduction of the street it will have the same width as the majority of streets in the city, such contention could not be made. . . . The damage which the appellants may sustain by reason of a diminution in value of their lands is not damage for which they are entitled to compensation. . . . 'The right of abutting owners in the streets is not of that absolute character that they can resist or prevent any and all interference with the street to their detriment, or which can be asserted to stay the hand of the municipality in the control, regulation, or improvement of the streets in the public interest, although it may be made to appear that the privileges which they had theretofore enjoyed, and the benefits they derived from the street in its existing condition, would be curtailed or impaired to their injury by the changes proposed.' (*Reining* v. *New York etc. Ry. Co.*, 128 N.Y. 157 [28 N.E. 640, 14 L.R.A. 133].) It has been held in other states that even the entire closing of a street upon which property abuts does not give to the owner a right of compensation, so long as there are other public streets by which he has access to his land. The mere inconvenience thereby experienced is not a damage for which he is entitled to compensation." (124 Cal. 274, 280.)

In *McCandless* v. *City of Los Angeles*, 214 Cal. 67 [4 P.2d 139], involving a claim for damages under article I, section 14, recovery was allowed because the injury was regarded as peculiar to the abutting property. The court declared:

"Cases illustrating the rule that an abutting property owner may suffer special damages peculiar to himself and independent of such damage as he sustains in common with other property owners and the public by reason of the construction of railroad tracks in the street adjacent to his property are these: *O'Connor* v. *Southern Pac. R. R. Co.*, 122 Cal. 681 [55 P. 688]; *Smith* v. *Southern Pac. R. R. Co.*, 146 Cal. 164 [79 P. 868, 106 Am.St.Rep. 17]; *Fairchild* v. *Oakland & Bay Shore Ry. Co.*, 176 Cal. 629 [169 P. 388]; *Lane* v. *San Diego Elec. Ry. Co.*, 208 Cal. 29 [280 P. 109]." (214 Cal. 67, 70, 71.) In holding that the subway, approach and railings as constructed greatly "interfered with the free use by the plaintiff of the street in front of her property for the purpose of ingress and egress" the court quoted from *Brown* v. *Board of Supervisors, supra,* as follows: "The property which an abutting owner has in the street in front of his land is the right of access and of light and air, and for an infringement of these rights he is entitled to compensation. This right is peculiar and individual to the abutting owner, differing from the right of passing to and fro upon the street, which he enjoys in common with the public, and any infringement thereof gives him a right of action." (See, also, *Eachus* v. *Los Angeles etc. Ry.*, 103 Cal. 614 [37 P. 750, 42 Am.St.Rep. 149]; *Lane* v. *San Diego Electric Ry. Co.*, 208 Cal. 29 [280 P. 109]; *Williams* v. *Los Angeles etc. Ry. Co.*, 150 Cal. 592, 594 [89 P. 330]; *Hargro* v. *Hodgdon*, 89 Cal. 623 [26 P. 1106]; *Geurkink* v. *City of Petaluma*, 112 Cal. 306 [44 P. 570]; *Rose* v. *State of California*, 19 Cal.2d 713 [123 P.2d 505].)

The identity of the tests in the nuisance cases and actions for damages under article I, section 14, is forcefully brought out in *Brown* v. *Rea*, 150 Cal. 171 [88 P. 713], in which the plaintiff sought to enjoin the construction of a railroad in a street. In sustaining a demurrer to the complaint the court declared: "Generally speaking, a public nuisance does not furnish ground for action by a private person, but such public nuisance may inflict upon an individual such peculiar injury as to entitle him to maintain a separate action for its abatement, or to recover damages therefor. . . . The injury to the individual must, however, be different in kind and not merely in degree from that suffered by the general public. (*Aram* v. *Schallenberger*, 41 Cal. 449; *Bigley* v. *Nunan*, 53 Cal. 403; *Hogan* v. *Central Pacific R. R. Co.*, 71 Cal. 83 [11

P. 876].) Ordinarily, an obstruction to a highway, if unauthorized and illegal, is a public nuisance. The injury is to the right to travel upon the highway, which right resides in the public generally. Such obstruction may, however, constitute a private nuisance as well. Every owner of land abutting upon a highway has a right of access from his land to the highway and from the highway to his land. This right of access is an easement, and an obstruction to the highway which at the same time obstructs this easement is a peculiar injury to the abutting landowner and gives him a cause of action." Holding that the complaint was insufficient because it did not allege that the "right of passage between the street and his premises" was impaired, the court declared: "These facts alone do not make it appear to the court that the plaintiff's right of passage between the street and his premises will be in any degree affected." The court later stated: "We do not overlook the consideration that, under the constitutional provision that 'private property shall not be taken or damaged for public use without just compensation having first been made' . . . damages may be recovered by an abutting owner for any public use of a street which damages his adjoining property or his easement of access to and from the street . . . But the complaint, whether seeking damages after the construction, or an injunction before, must show some actual or threatened injury to a private property right of the plaintiff, and this the present complaint fails to do." (150 Cal. 171, 174, 175; see, also, *Wolff* v. *City of Los Angeles,* 49 Cal.App. 400 [193 P. 862]; *City of San Mateo* v. *Railroad Commission,* 9 Cal.2d 1 [68 P.2d 713].)

Under the majority opinion new private property rights representing millions of dollars have been carved out of public streets and highways, at the expense not alone of the public treasury but of the public safety. Of recent years the growth of traffic has necessitated the construction of highways with fewer intersecting streets to expedite the flow of traffic and reduce the rate of motor vehicle accidents. Such highways have been constructed through the city of San Rafael, and the Arroyo Seco Parkway from Los Angeles to Pasadena, and the construction of many more is contemplated. In such cases it will be necessary either to close the cross streets or to carry them under or over the freeway, both costly projects. The plans contemplate overhead or subway cross-

ings every few blocks over the freeway, necessarily creating cul-de-sacs of the remaining streets. Similar improvements are involved in the separation of grades of railroads and highways, for it is usually necessary to make a dead end of one or more streets as a highway is raised or lowered to cross the railroad tracks. In the present case the cul-de-sac on Sterling Street was an integral part of the rearrangement of the streets of the city of San Francisco made necessary by the construction of the San Francisco-Oakland Bay Bridge.

The cost of making such improvements may be prohibitive now that new rights are created for owners of property abutting on streets that would be at right angles to the improvements, for these rights must be condemned or ways constructed over or under the improvements. The construction of improvements is bound to be discouraged by the multitude of claims that would arise, the costs of negotiation with claimants or of litigation, and the amounts that claimants might recover. Such claims could only be met by public revenues that would otherwise be expended on the further development and improvement of streets and highways.

It must be remembered that the question is not whether existing easements should be taken without compensation, but whether private rights should be created for an arbitrarily chosen group of private persons, necessitating tribute from the public if it exercises public rights of long standing in the interest of safe and expeditious travel on public thoroughfares.

Respondents' petition for a rehearing was denied January 17, 1944. Edmonds, J., and Traynor, J., voted for a rehearing.